## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**CHERYL WEIMAR**

     **Plaintiff,**

**v.**                                        **Case No.: 5:19-cv-00548-CEM-PRL**

**THE FLORIDA DEPARTMENT OF
CORRECTIONS, KEITH TURNER,
and RYAN DIONNE**

     **Defendants.**

_____/

### DEFENDANT FLORIDA DEPARTMENT OF CORRECTIONS'
### MOTION FOR SUMMARY JUDGMENT

     The Defendant The Department of Corrections, ("FDC" or the "Department"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 3.01, hereby moves for summary judgment in its favor and states as follows:

### BACKGROUND

     The Plaintiff is a current inmate housed by FDC. According to her Second Amended Complaint (the "SAC"), Plaintiff was injured on August 21, 2019, as a result of the actions of individual Defendants Keith Tuner ("Turner") and Ryan Dionne ("Dionne"). *See* SAC, at ¶ 17, 32–34 (Doc. 35). According to Plaintiff, the incident stemmed from her inability to perform her job functions (i.e., clean toilets). *Id.* at ¶ 19.  She claims that she requested a reasonable accommodation for her physical disability in connection with her work assignment and that Defendants denied that request. *Id*. at ¶ 22 and 21. Plaintiff filed her first complaint on September 3, 2019 (Doc. 1) and the SAC on November 1, 2019.

Rather than provide a reasonable accommodation, Plaintiff claims that Turner and Dionne became angry at her, which resulted in her declaring an inmate medical emergency. *Id*. at ¶ 24. This led Turner and Dionne to become even angrier, and a confrontation ensued. *Id*. at ¶ 25. As the confrontation escalated, Plaintiff declared a psychological emergency. *Id*. at ¶ 29. Turner and Dionne, however, failed to respond appropriately (i.e., they failed to follow FDC's procedures). *Id*. at ¶ 31. Instead, they knocked her to the ground, brutally beat her with blows to the head, neck, and back, dragged her like a rag doll, and caused her life threatening and permanent injuries. *Id*. at ¶¶ 32-39. As a result, Plaintiff is now a quadriplegic. *Id.* at ¶ 39.

Plaintiff has sued FDC, Turner, and Dionne as a result of the alleged incidents of August 21, 2019. Through the SAC, she alleges two causes of action against FDC. The first is for the alleged violation of Title II of the American with Disabilities Act ("ADA"). *See* SAC, Count II (Doc. 35). The second is for the alleged violation of Section 504 of the Rehabilitation Act ("RA").

Because neither Turner nor Dionne were qualifying "officials" under the ADA or the RA, FDC is entitled to summary judgment as a matter of law on both claims. Moreover, since Weimar failed to exhaust her administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), FDC is entitled to summary judgment as a matter of law on both claims.

## ARGUMENT

**A.      Summary Judgment Standard.**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance

of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing that there are no genuine disputes of material fact. *Hickson Corp. v. Northern Crossarm* Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, and admissions on file to designate facts showing a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

**B.      Standard for Awarding Compensatory Damages under the ADA and RA.**

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA similarly provides, as relevant here, that "[n]o otherwise qualified individual with a disability in the United States . . .  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Given the textual similarities between the two statutes, "the same standards govern" claims under both, and courts "rel[y] on cases construing [Title II and § 504] interchangeably." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole County*, 610 F.3d 588,

604 (11th Cir. 2010) (quoting *Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 2009)). Moreover, "it is appropriate to look to Title IX case law for guidance in examining discriminatory intent" under Title II of the ADA and Section 504 of the RA. *J.S., III by & through J.S. Jr. v. Hous. County Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017). "In other words, whatever we have said—or say now—about Title II goes for § 504, and vice versa." *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133–34 (11th Cir. 2019).

To state a claim under either Title II or Section 504, a plaintiff must establish "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Silberman*, 927 F.3d at 1134 (quoting *Bircoll v. Miami-Dade County.*, 480 F.3d 1072, 1083 (11th Cir. 2007)). But establishing those three elements entitles a plaintiff only to injunctive relief. *Id.* (citing *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017)). In order to be awarded compensatory damages, "a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'" (citing *Liese v. Indian River County. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012)).

"Deliberate indifference" is an "exacting standard." *J.S.*, 877 F.3d at 987. It requires proof that "the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *Liese*, 701 F.3d at 344 (citation omitted). "Moreover, in order to hold a government entity liable, the plaintiff must demonstrate that an 'official who at a minimum has authority to address the alleged discrimination and to institute corrective

measures on the [entity's] behalf' had 'actual knowledge of discrimination in the [entity's] programs and fail[ed] to adequately to respond.'" *Silberman*, 927 F.3d at 1134 (citing *Liese*, 701 F.3d at 349)). To qualify, that "official" must be "high enough up the chain-of-command that his [or her] acts constitute an official decision by the [entity] not to remedy the misconduct." *Id. (*quoting *J.S.*, 877 F.3d at 987 (internal quotation marks omitted)).

In *Silberman*, the plaintiff suffered from severe depression with recurrent psychotic episodes. *Id*. at 1128–29. To help him cope with his illness, his psychiatrist prescribed him a service dog. *Id*. Silberman later brought an action under Title II of the ADA and Section 504 of the RA, claiming that bus drivers for the Miami-Dade Transit Authority refused to accommodate him as a qualified person with disabilities. *Id*. Applying the standards set forth above, the trial court dismissed the claims and the Eleventh Circuit affirmed. The Eleventh Circuit held as follows:

> We have little difficulty concluding that MDT bus drivers are not qualifying "officials." With all due respect, they simply aren't high enough up the org chart to permit a reasonable inference that, through their actions, they speak for MDT as a whole. To be clear, it's not enough that one be an "official" in the abstract—which is to say, potentially any employee. *Liese*, 701 F.3d at 349. Rather, "the official [must] have the knowledge of and authority to correct an entity's discriminatory practices." *Id*. (emphasis added). Bus drivers—akin to what the First Circuit has called "line employee[s]," *Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019)—just don't fit that bill. *See also Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1255 (11th Cir. 2010) (holding that "janitorial supervisor was plainly not high enough up the chain-of-command" to impose liability on a school district).
>
> To be sure, an "official" needn't be so high up the chain of command that she is "authorized to set an entity's policy." *Liese*, 701 F.3d at 349–50. But she must be high enough that her actions "constitute an official decision by the [entity] itself not to remedy the misconduct." *Doe*, 604 F.3d at 1255 (internal quotation marks and citation omitted). That, we have said, requires "substantial supervisory authority." *Liese*, 701 F.3d at 350. *Liese* itself—which concerned a hospital's failure to provide sign-language interpreters to deaf patients—is illustrative. There, we held that a reasonable jury could conclude that doctors had the necessary supervisory authority

because they "could overrule a nurse's decision to not provide" an accommodation and because no evidence suggested that the doctors' decisions "were subject to reversal" by anyone else. *Id*. Conversely, we indicated that nurses were not "officials" because, unlike the doctors, they didn't enjoy "complete discretion" over whether to provide an accommodation. On the *Liese* spectrum, it seems obvious to us that MDT bus drivers are more akin to the nurses than the doctors.

\* \* \* \* \* \*

Silberman insists that MDT bus drivers are "officials" because they enjoy "complete discretion at a key decision point" in the "administration of MDT's public transportation services"—as evidenced by their ability to deny Silberman's point-of-service request to travel with [his dog]. Silberman's argument fails for two reasons. First, it reads the "key decision point" language (which comes from *Liese*) out of context. The relevant question is not whether the drivers had "complete discretion" to make the initial decision to deny Silberman services, but rather whether they had discretion at a "key decision point in the administrative process"—which they plainly didn't. *Liese*, 701 F.3d at 350 (emphasis added). Second, Silberman's argument proves too much. If it were enough that the bus drivers here played a key role in the decision to deny Silberman an accommodation in the first instance, the definition of "official" would be so broad as to encompass "every single employee" who is in a position to grant or deny an individual service. *Id*. at 349. That reading would "essentially eviscerate[ ] the requirement that there be a decision by an official," *id*., thereby reducing the *Liese* standard to a variant of vicarious liability and making compensatory damages the rule rather than the exception. *Cf. also Santiago v. Puerto Rico*, 655 F.3d 61, 75 (1st Cir. 2011) ("Title IX does not sweep so broadly as to permit a suit for harm-inducing conduct that was not brought to the attention of someone with authority to stop it."). Put simply, if MDT bus drivers are "officials," then everyone is.

## C.    Neither Turner nor Dionne were Officials for Purposes of the ADA and RA.

Plaintiff's ADA and RA claims against FDC are based on the actions of Turner and Dionne. In her motion for an adverse inference against the Department, Plaintiff asserts that "[t]he ADA and RA claims against FDC are based upon the actions of its employees, Turner and Dionne, which are imputed to FDC." (Doc. 88, at 2.) Plaintiff's assertions and claims against FDC fail to recognize the standard explained in *Silberman*, i.e., that a governmental agency cannot be held liable under the ADA or RA merely for actions of its employees, unless

the employees are high enough up the organizational chart to permit a reasonable inference that their actions speak for the entity as a whole. Clearly, Turner and Dionne do not speak for the Department as a whole. Instead, they are within the class of "line employees" described in *Silberman*.

Dionne was employed as a correctional officer. *See* Affidavit of Stacey Tosi, attached hereto as Exhibit 1. His job duties included supervising inmates commensurate with the level of risk they represent, and maintaining facility security. *Id*. at ¶¶ 6-8.   Similarly, while employed by FDC, Turner was a correctional officer lieutenant. His job duties included responsibility for supervising Correctional Officers and Correctional Officer Sergeants, planning, organizing, and coordinating the activities of all Correctional Officers and Correctional Officer Sergeants assigned to a shift, and working with employees to ensure proper security coverage. *Id*. Neither of their job duties included reviewing requests for accommodations or recommending approvals, modified approvals, or denials thereof. *Id*. at ¶ 9; *see also* Affidavit of Sexton ¶ 10, attached hereto as Exhibit 3.

To be clear, FDC has a process for inmates who are requesting accommodations, which is set forth in FDC Procedure 604.101. That procedure is attached hereto as Exhibit 2. That process involves the use of the DC2-530A form, which is completed and sent to an Institutional ADA Coordinator.[1]   *See* Ex. 2, at 12–14. The Institutional ADA Coordinator reviews the request, recommends approval, modified approval, or denial, and completes a DC2-530B form. *Id.* Both forms are sent to the Central Office ADA Coordinator or designee, along with any

---

[1] The Institutional ADA Coordinator is the staff member designated by the Warden to respond to reasonable modification or accommodation requests and grievances from inmates, staff, and the public pertaining to ADA issues.  *See* Ex. 2, at 3.

other information provided with the request, and the Central Office ADA Coordinator or designee will either agree, disagree, modify, or return without processing.  *Id*.  Inmates who have a complaint relating to the ADA, or who believe they have been discriminated against on the basis of disability, may file a grievance by following the process set forth in Chapter 33-103, F.A.C.  *Id*. at 16. Inmates may also appeal the denial of a request for an accommodation. *Id.* Neither Turner nor Dionne have any role whatsoever in any of the foregoing ADA procedures.  *See* Affidavit of Stacey Tosi at ¶¶ 8-9, attached hereto as Exhibit 1.  In fact, Plaintiff herself acknowledges that FDC has ADA procedures (and staff members) to handle requests for accommodation completely outside of the roles of Turner and Dionne.  *See* SAC, at ¶¶ 42–43 (Doc. 35).

Although, in his position as a Lieutenant, Turner supervised Correctional Officer Dionne, Turner's position as a Lieutenant is not high enough to impute liability to the FDC based on respondeat superior. As explained in *Floyd v. Waiters*, in the context of a Title IX case, to survive summary judgment in a cause of action against the public entity for the discriminatory acts of its employees, the Plaintiff must establish: first, "some supervisor with authority to take corrective action was placed on notice of the bad conduct," and second "the supervisor possessing this authority was a school official high enough up the chain-of-command that his acts constitute an official decision by the [public entity] itself not to remedy the misconduct." 171 F.3d 1264 (11th Cir. 1999). Even as a Lieutenant supervising Correctional Officers and Correctional Officer Sergeants, Turner was many steps removed from any position high enough up the FDC chain-of-command for his actions to constitute an official decision by the FDC not to remedy any alleged misconduct. The Plaintiff's ADA and

RA claims are based exclusively on the actions of Turner and Dionne. As such, the FDC is entitled to judgment as a matter of law on the Plaintiff's ADA and RA claims.

In a strikingly similar case, the court in *Young v. Miami-Dade County*, 2020 WL 2110012 (S.D. Fla. April 21, 2020) dismissed a plaintiff's claims under the ADA against Miami-Dade County following a beating of an inmate by detention officers. There, plaintiff was arrested and incarcerated in a Miami-Dade County detention center. *Id*. at *1. He suffered from severe psychiatric conditions, including major depression, schizoaffective disorder, and polysubstance abuse. *Id*. The County and detention staff were aware of plaintiff's condition and assigned him to an area of the detention center housing inmates with psychiatric problems. *Id*.

After having been assigned an initial cell, one of the defendant officers transferred plaintiff to a different cell, which housed another inmate. *Id*. Plaintiff objected to the transfer, particularly because the new cell was covered in urine and feces. *Id*. When plaintiff refused to enter, the officer forcibly pushed him inside. *Id*. Plaintiff continued to voice his objections and requested a mop to clean the cell. *Id*. Because the officer refused that request, and due to the putrid conditions, plaintiff created a makeshift mop with his blanket and used the toilet as the mop bucket. *Id*. While he was attempting to clean, several officers entered the cell and severely beat him. *Id*. at *2. They then moved him to a suicide watch section of the detention center, and he was later moved to another cell. *Id*.

Plaintiff was visited by two detention center doctors, whom he told of the injuries to his head, neck, back, chest, and ribs. *Id*. Although they promised to provide him pain medication, they failed to do so. *Id*. Plaintiff was then seen by a third doctor, who ordered his

transfer to the detention center clinic. *Id*. After later being transferred to a different facility, Plaintiff was then seen by a fourth doctor, who determined through x-rays that plaintiff was bleeding internally. *Id*. That doctor immediately ordered plaintiff's transfer to a hospital, where he underwent two emergency life-saving surgeries. *Id*

Plaintiff brought suit against the officers involved (one of whom was a lieutenant) and the County. *Id*. at *3. As against the County, plaintiff asserted a claim under Title II of the ADA for disability-based discrimination. *Id*.

Based largely on the holding of *Silberman*, the court dismissed the ADA claim because the officers involved were not officials with authority to address the alleged discrimination and institute corrective measures on the entity's behalf. *Id*. at *7. The court concluded as follows:

> Plaintiff alleges "[a]s a result of [the County's] deliberate indifference to ongoing discrimination against [Plaintiff] as a result of his mental illness, [Plaintiff] suffered horrific injuries." This allegation amounts to nothing more than a bare bone recital of the deliberate indifference element. Notwithstanding, **Plaintiff insists the County is liable for the actions of its "agents and employees when they commit violations of the ADA." Not so**. Unnamed agents and employees "simply aren't high enough up the org chart to permit a reasonable inference that, through their actions, they speak for [the County] as a whole." *Silberman*, 927 F.3d at 1135. Plaintiff has not sufficiently alleged a County official who was deliberately indifferent with "actual knowledge of discrimination in the [County's] programs and fail[ed] adequately to respond." As presently framed, therefore, Plaintiff may not hold the County liable for compensatory damages under Title II of the ADA.

*Id*. (internal quotations and alterations omitted; emphasis added).  The facts of *Young* are indistinguishable from the facts here.

The same result has occurred in other cases involving law enforcement officers.  In *Estate of Federico Osorio v. Miami-Dade County*, 16-20200-CIV, 2017 WL 3721505 (S.D. Fla. Feb. 10, 2017), the court dismissed a claim under Title II of the ADA resulting from a law enforcement officer's use of force against a disabled individual. In its decision, the court noted

that a claim for compensatory damages under the ADA must be based on a showing that the government's conduct was the result of intentional discrimination. *Id*. at *3. Citing the Eleventh Circuit's decision in *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 344, *3 (11th Cir. 2012), the court concluded that "a plaintiff must show deliberate indifference on the part of 'an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the [organization's] behalf [and who] has *actual knowledge* of discrimination in the [organization's] programs and fails to adequately respond." *Estate of Federico Osorio*, 2017 WL 3721505, at *3 (internal alterations and emphasis in the original; citation omitted). The trial court's ruling was affirmed in *Estate of Federico Osorio v. Miami-Dade County*, 717 Fed. Appx. 957 (11th Cir. 2018) ("Specifically, the complaint failed to identify a single official who allegedly had authority to address the alleged discrimination, much less knowledge of and deliberate indifference to the alleged discrimination."). *See also Welch v. City of Hartselle*, 423 F. Supp. 3d 1277 (N.D. Ala. 2019) ("Plaintiff has not alleged sufficient facts to give rise to a plausible inference that a city official had actual knowledge of discrimination against the deaf or hearing impaired by police officers, in addition to the authority to act and institute corrective measures, and failed to respond.").

Simply put, neither Turner nor Dionne were ADA coordinators or officials within the Department, nor did they have any role in addressing discrimination and instituting corrective measures. Plaintiff has not identified any such official and, based on her legally incorrect assertion that it was the actions of Turner and Dionne that create the ADA liability, summary judgment should be granted in FDC's favor.

D.     **Standard For Exhausting Administrative Remedies Under The Prison Litigation Reform Act.**

"The PLRA requires inmates to exhaust available administrative remedies before filing a lawsuit: 'No action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted.'" *Bryant v. Rich*, 530 F.3d 1368, 1372 (11th Cir. 2008) (quoting 42 U.S.C. § 1997e(a)). Exhaustion of all available administrative remedies is mandatory, and is a pre-condition to suit. *Booth v. Churner*, 532 U.S. 731, 739 (2001). The requirement is not within the discretion of the court. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Rather, "where Congress specifically mandates, exhaustion is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992). The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. *Porter*, 534 U.S. at 532. Exhaustion is required whether the plaintiff seeks declaratory or injunctive relief, monetary damages, or both. *Booth*, 532 U.S. at 734. Inmate ADA grievances must be exhausted and, in fact, are specifically addressed in Rule 33-103. For complaints regarding the ADA or medical treatment, an inmate may bypass the first step of an informal grievance. *Rodriguez v. Asencio*, 2019 WL 3916268 at *3 (N.D. Fla. July 29, 2019).

The purpose of the PLRA's requirement that a prisoner exhaust his administrative remedies before bringing suit relating to prison conditions is "to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Gipson v. Renninger*, 750 Fed.Appx. 948, 951 (2018). As such, the exhaustion requirement is not satisfied by the filing of an untimely grievance or grievances that are filed in non-compliance with procedural rules. *Woodford*, 548 U.S. at 83-84, 95-95, 101-03.

To this end, a prisoner must comply with the rules "defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007). However, a prisoner "is not required to exhaust remedies if they are not 'available.'" *Gipson v. Renninger*, 750 Fed.Appx. at 951 (quoting *Ross v. Blake* 136 S.Ct. 1850, 1855 (2016)). In reviewing the question of exhaustion,"[t]he only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." *Smith v. Terry*, 491 F. Appx. 81, 83 (11th Cir. 2012) (citing *Harris v. Garner*, 216 F.3d 970, 981 (11th Cir. 2000).

### E.    Plaintiff Did Not Exhaust Her Available Administrative Remedies.

In order to exhaust her administrative remedies, Plaintiff was bound to follow the administrative procedures set for in Chapter 33 of the Florida Administrative Code. Chapter 33 provides a system for prisoners to submit grievances and appeal grievance rulings with which they are dissatisfied. Fla. Admin. Code Rule 33-103.001. Thus, "[a] Florida inmate's administrative remedies are not exhausted until [her] grievance has finally been appealed to, and denied by, the Secretary of the Florida Department of Corrections." *Lyons v. Trinity Serv. Group, Inc.*, 401 F.Supp.2d 1290, 1295 (S.D. Fla. 2005). In order to be timely, an informal grievance must be received by the designated prison official <u>within twenty calendar days of the incident date</u>. Fla. Admin. Code §33-103.011(1)(a).

FDC provides inmates with a three-step sequential grievance process for exhausting administrative remedies: 1) informal grievance; 2) formal grievance; and then 3) administrative appeal. Fla. Admin. Code §33-103.005, 103.006, and 103.007. As such, once a prisoner has completed this three-step process, she is considered to have exhausted her administrative

remedies. *See Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004). An inmate may also present certain limited categories of grievances directly to the Secretary of the Department of Corrections ("Secretary"). These categories include "[e]mergency grievances and grievances of reprisals." Fla. Admin. Code §33-103.007(3)(a).

Attached as Exhibit 4 is the declaration of Bureau Chief Alan McManus, who reviewed records relating to Plaintiff and could not locate any grievances relating to the August 21, 2019 incident. Thus, Plaintiff did not file a grievance relating to the August 21, 2019 incident. *Id.* In fact, there is no evidence that the Plaintiff, at any time, has filed a grievance related to the denial of an accommodation, related to her assignment as a houseman, or related to any alleged medical condition. *Id.* at ¶¶ 8-9. The Plaintiff claims that she had a history of a hip problem. (*See, e.g.*, Doc. 35 ¶ 12). There is no record reflecting that the Plaintiff ever went to medical and for any claim of hip issues. (Docs. 80-1 thru 80-12).

### F.      Plaintiff Did Not Seek an Extension of Time to File Any Grievance.

An exception to the exhaustion rule exists in instances where an inmate has sought leave to file an out-of-time grievance, but an inmate who has not sought said leave cannot be considered to have exhausted his administrative remedies. *Harper v. Jenkin*, 179 F.3d 1311, 1312 (11th Cir. 1999). An inmate may obtain an extension of time in which to file an informal, formal, or direct grievance by making a request for an extension in writing and by demonstrating that it was not feasible to file the grievance within the relevant time periods and that the inmate made a good faith effort to file in a timely manner. Fla. Admin. Code §33-103.0011(2).

Here, neither Plaintiff nor her attorneys sought an extension of time in which to file

any grievance relating to the August 21, 2019 incident. Exhibit 4 at ¶6. In fact, Plaintiff filed this instant case (September 3, 2019) before her initial time to exhaust expired (September 10, 2019), which was in direct conflict with the purpose of the PLRA in affording corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. *Gipson v. Renninger*, 750 Fed.Appx. at 951.

### G.   Administrative Remedies Were "Available" to Plaintiff.

Plaintiff asserts that "administrative remedies were and are unavailable to her and, therefore, she is not subject to the . . . PLRA's exhaustion requirement." SAC at 2-3, ¶5. While a few scenarios exist which can make an administrative remedy "unavailable" to a prisoner, none of them can be found here. In *Ross v. Blake*, the Court identified three circumstances in which an administrative remedy would be considered "not available." 136 S. Ct. at 1862.

> First, an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. Finally, a remedy may be unavailable when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Id.* at 1853-54.

Turning to the first point, nothing in the record shows that FDC was unable or unwilling to provide any relief to Plaintiff. One such instance where an administrative remedy is not available is where "a prison handbook directs inmates to submit their grievances to a particular administrative office – but in practice that office disclaims the capacity to consider those petitions." *Id.* at 1859. Here, the record contains no evidence that there was any malfunction or inadequacy with the remedy sought within the FDC Inmate Grievance Procedure. *Miller v.*

*Tanner*, 196 F.3d 1190, 1193 (11th Cir.1999) (reasoning that the availability of administrative remedies is not determined based on their adequacy or effectiveness).

Furthermore, while Plaintiff may have been limited in her ability to file a grievance due to the nature of her injury, she did not seek assistance from either FDC staff or her attorneys. In *Tilus v. Kelly*, the plaintiff was hospitalized due to an excessive force incident during the time period in which he had to file a grievance. 2012 WL 12894237, at *9 (S.D. Fla. March 22, 2012). The plaintiff claimed that he could not file this claim because he was hospitalized and, once he was discharged, he was placed on psychiatric watch where grievances could not be filed. *Id.* The court held that he had not exhausted his administrative remedies because "the jail expressly provid[ed] that staff members [were] required to assist inmates in completing the form if the inmate is physically or mentally unable to complete the form." *Id.* Furthermore, the court held that there was "no indication whatever in the record that he was so incapacitated that he could not seek assistance from jail staff to complete a grievance form." *Id.*; *see* Fla. Admin. Code §33-103.015(1) ("Inmates shall be allowed to seek assistance from other inmates or staff members in completing the grievance forms[.]").

Similarly here, the Plaintiff filed a detailed complaint on September 3, 2019.  She cannot argue that she was so incapacitated that she could not seek assistance from FDC staff to complete the grievance forms. Moreover, the record is devoid of any evidence that Plaintiff sought assistance from her attorneys to file the grievance forms. *Williams v. California*, 2017 WL 5128007, at *3 (N.D. Ca. Nov. 6, 2017) (holding that the grievance process was "available" to plaintiff during the period of appealing his grievance as he was represented by counsel at that time).

While there is caselaw stating that an inmate who files an untimely grievance has exhausted his administrative remedies when his injuries prevented him from filing a timely grievance, *see Days v. Johnson*, 322 F.3d 863 (5th Cir. 2003), the important part of the analysis in that context is the inmate's filing of grievance that is subsequently denied as untimely. In *Foy v. La. Dep't. of Public Safety and Corr.*, the Middle District of Louisiana distinguished this caselaw, stating as follows:

> It is undisputed in this case that Plaintiff has never attempted to file a grievance based on the incident in question. In *Parker v. Adjetey*, an inmate was in a coma until after the fifteen day period and was unable to timely file a Step 1 grievance. He did not attempt to file a Step 1 grievance because the time deadlines had already expired. The Fifth Circuit affirmed the dismissal of the complaint holding that he had not attempted to exhaust his administrative remedies that were available to him. Moreover, in *Ferrington v. Louisiana Department of Corrections*, the Fifth Circuit rejected an inmate's argument that he should be excused from the exhaustion requirement due to blindness since his alleged blindness did not prevent him from filing his Section 1983 lawsuit.
> <u>In the present case, it is obvious that Plaintiff's physical and mental injuries did not preclude him from filing this lawsuit</u>; thus, Plaintiff has presented no excuse for the failure to pursue his administrative remedies when he was physically and mentally capable of doing so. Had he filed an untimely grievance, and had Defendant rejected such grievance for untimeliness, Fifth Circuit jurisprudence instructs that Plaintiff would have satisfied the exhaustion of his administrative remedies. <u>It is undisputed that Plaintiff made no attempt to pursue administrative remedies for this incident. Accordingly, there is no genuine issues of material facts in dispute, and the Defendant is entitled to summary judgment</u>.

*Foy*, 2018 WL 3546235 (M.D. La. July 23, 2018) (emphasis supplied). The case of *Parker v. Adjetey*, cited by the Middle District of Louisiana in *Foy*, is particularly relevant to the case at hand. In *Parker*, the inmate-plaintiff contended that he could not exhaust his administrative remedies because he was hospitalized and in a coma, when he was released from the hospital, the period for filing a grievance had expired, and that an attempt to file a grievance would have been futile. *Parker v. Adjetey*, 89 Fed. App'x. 886, 887 (5th Cir. 2004). The plaintiff-inmate in

*Parker*, much like the Plaintiff here, did not attempt to file a grievance. The Fifth Circuit cited to *Days* and then stated: "Unlike the inmate in *Days*, Parker did not attempt to exhaust the administrative remedies that were personally available to him. Accordingly, we affirm dismissal of Parker's civil rights complaint for failure to exhaust available administrative remedies." *Parker*, 89 Fed. App'x at 887-88 (emphasis removed).

"Exhaustion is mandatory and [courts] have strictly construed the exhaustion requirement of 42 U.S.C. § 1997e." *Id.* Like the inmate in *Foy*, the Plaintiff's injuries and medical state following the August 21, 2019 incident did not prevent her from filing the case at hand. The record contains no evidence that she ever even attempted to file a grievance. As such, her claims merit dismissal for failure to exhaust her available administrative remedies.

Turning to the second point, the record does not contain any evidence that the administrative rules are so opaque as to render them incapable of use. An instance which would show that the rules were incapable of use might include if the officers required an action by the prisoner not specified in the rules themselves. *Jean-Denis v. Inch*, 2020 WL 3001933, at *4-5 (N.D. Fla. May 11, 2020); *see Ross*, 136 S. Ct. at 1859 (finding that an administrative remedy is "essentially 'unknowable' – so that no ordinary prisoner can make sense of what it demands – then it is also unavailable.") (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1323 (11th Cir. 2007)); *see also Pavao v. Sims*, 679 Fed.Appx. 819, 823 (11th Cir. 2017) ("Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available."). Plaintiff does not contend that she attempted the grievance process, yet was rejected because of an opaque rule. Plaintiff undisputedly did not file a grievance relating to the August 21, 2019 incident. Exhibit 4 at ¶5.

Turning to the third point, Plaintiff does not claim she was unable to take advantage of the procedures due to misrepresentation or intimidation, which would be an exceedingly high bar to demonstrate, regardless. Pursuant to *Turner v. Burnside*, for the exhaustion requirement to be lifted as unavailable due to "a prison official's serious threats of substantial retaliation against an inmate for lodging or pursuing in good faith a grievance," both of the following conditions must be met: "(1) the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance process that the inmate failed to exhaust." 541 F.3d 1077, 1085 (11th Cir. 2008). Even so, while a similarly situated inmate may be deterred from filing a grievance at the prison, such an inmate would not be deterred by filing a grievance that bypasses the prison officials and is filed directly with the Office of the Secretary. *Staley v. Tucker*, 5:13-cv-25-RS-EMT, 2014 WL 752420, at \*4 (N.D. Fla. Feb. 25, 2014). Further, a realistic threat of retaliation abates once the prisoner is transferred from the prison where the prisoner was threatened. *Bryant v. Rich*, 530 F.3d at 1379; *Poole v. Rich*, 312 F. App'x 165, 167-68 (11th Cir. 2008).

Here, the record is devoid of any evidence that Plaintiff was deterred from lodging a grievance relating to the August 21, 2019 incident, via threats or otherwise. *Maldonado v. Unnamed Defendant*, 648 Fed.Appx. 939, 952 (11th Cir. 2016) (holding that the prisoner did not show that the defendants prevented him, via threats or otherwise, from filing a grievance concerning the incident). Furthermore, neither Plaintiff nor her attorneys bypassed the prison officials by filing the grievance with the Office of the Secretary. *Funk v. Washburn*, 2007 WL

1747384, at *2 (M.D. Fla. June 18, 2007) (holding that the court takes judicial notice that the Florida Department of Corrections' exhaustion procedures provide an exception to the typical filing procedures when an inmate fears reprisal). Specifically, an inmate may bypass the filing of informal and formal grievances and file emergency grievances, grievances of reprisal, and grievances of a sensitive nature directly with the Office of Secretary. Fla. Admin. Code Rule 33-103.005(1). Instead, Plaintiff filed this instant case (September 3, 2019) during the initial time she had to exhaust (September 10, 2019). Furthermore, if Plaintiff was faced with a realistic threat of retaliation, that threat was immediately eliminated once she was transported to seek medical treatment, wherein Defendants Turner and Dionne did not accompany her.

Simply put, Plaintiff did not satisfy her requirement to exhaust her available administrative remedies relating to the August 21, 2019 incident before she filed this instant case. Accordingly, her claims should be dismissed.

## CONCLUSION

For the above stated reasons, FDC is entitled to summary judgment as a matter of law.

Respectfully submitted,

/s/Juan C. Martinez
Juan C. Martinez
Florida Bar No. 009024
GrayRobinson, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887
Juan.martinez@gray-robinson.com
Gregory Hearing
Florida Bar No. 817790
401 East Jackson Street, Suite 2700

Tampa, FL 33602
Telephone: (813) 273-5000
Facsimile: (813) 273 5145
Attorneys for the Defendant FDC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

this 29th day of July, 2020, by CM/ECF electronic filing to the Clerk of Court and to the

following:

Ryan J. Andrews                                     Robert B. Buchanan
John M. Vernaglia                                   Siboni & Buchanan, PLLC
Steven R. Andrews                                   1900 SE 18th Avenue, Suite 300
The Law Offices of Steven R. Andrews, P.A.          Ocala, Florida 34471
822 North Monroe Street                             rbuchanan@sbtrial.com
Tallahassee, Florida 32303                          aperry@sbtrial.com
ryan@andrewslaw.com
john@andrewslaw.com
steve@andrewslaw.com

Thomas Robert Thompson
Mallory R. Bennett
Thompson, Crawford & Smiley, P.A.
1330 Thomasville Road
Tallahassee, FL  32303
tom@tcslawfirm.net
Mallory@tcslawfirm.net


                                                    /s/ Juan C. Martinez
                                                    Attorney

21